UNITED STATES of America,
Plaintiff,

v.

Louis B. OBERHAUSER, Defendant.

No. CRIM 99–20(7) DWF/AJB.

United States District Court,
D. Minnesota.

April 4, 2001.

Lizabeth A. McKibben, Assistant United States Attorney, Minneapolis, MN, counsel for Plaintiff.

William J. Mauzy, Mauzy Law Office, Minneapolis, MN, counsel for Defendant.

## ORDER AND MEMORANDUM

FRANK, District Judge.

The above-entitled matter is before the Court on Defendant Louis B. Oberhauser's motion for judgment of acquittal, pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, or, alternatively, for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. The motions are opposed in all respects by the United States. Based upon the extensive written submissions and presentations of counsel, and the Court having reviewed the file in this matter and being otherwise duly advised in the premises, the Court hereby enters the following:

### ORDER

1. Defendant Louis B. Oberhauser's motion for judgment of acquittal on Count 53 (money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i)) (Doc. No. 333) is hereby GRANTED for the reasons set forth in the attached memorandum. The Court respectfully directs that judgment of acquittal with respect to Count 53 be entered consistent with the Court's ruling.

2. Defendant Louis B. Oberhauser's motion for judgment of acquittal on Count 59 (money laundering in violation of 1956(a)(1)(A)(i)) (Doc. No. 333) is hereby **GRANTED** for the reasons set forth in the attached memorandum. The Court respectfully directs that judgment of acquittal with respect to Count 59 be entered consistent with the Court's ruling.

3. Pursuant to Rule 29(d) of the Federal Rules of Criminal Procedure, Defendant Louis B. Oberhauser's motion for a new trial (Doc. No. 334) is **CONDITIONALLY GRANTED** in the event that the judgment of acquittal is vacated or otherwise reversed on appeal.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

### MEMORANDUM

#### I. Introduction

The Defendant, Louis B. Oberhauser, was indicted for 66 federal crimes in a second superseding indictment by a United States Grand Jury. Defendant Oberhauser was tried with Co–Defendant Richard C. Gravatt in a trial lasting from September 8 to October 11, 2000. Pursuant to a jury

verdict issued on October 18, 2000, Defendant Oberhauser was found guilty of two of the sixty-six charges, Counts 53 and 59.

Count 53 charged money laundering in violation of Title 18 U.S.C. § 1956(a)(1)(A)(i) involving a $160,000 wire transfer from the Group Resources, Inc. account at Sun Trust Bank into the Oberhauser & Neveaux Norwest Bank IOLTA trust account on August 28, 1996. Count 59 charged money laundering in violation of Title 18 U.S.C. § 1956(a)(1)(A)(i) involving a $160,000 wire transfer from the Oberhauser & Neveaux IOLTA trust account to ChildHelp on November 25, 1996. The Defendant was acquitted of all other counts in the indictment, including Count 1 (conspiracy to commit money laundering); Counts 2–15 (wire fraud); Counts 16–23 (mail fraud); Counts 24–29 (money laundering relating to the purchase of the Firststar Building); Counts 50–52, 54–58, 60–61 (money laundering); Count 62 (conspiracy to commit money laundering); Counts 63–69 (wire fraud relating to investor Achilles Buser); Counts 70–81 (money laundering); and Counts 82–86 (money laundering).

Being mindful of the dedicated jury that sat through six weeks of testimony and argument, and then deliberated for four days on a total of eighty-nine counts between two defendants, it is this Court's considered view that there is insufficient evidence to support the guilty verdict with respect to Counts 53 and 59 against Defendant Oberhauser.

## II. Factual Background

Eight individuals were indicted in relation to the underlying circumstances of the above-entitled matter. Originally, the indictment charged Defendants Murray Evans, Richard Gravatt, Joe King, Richard King, Frank Taylor, and Scott Wallis. All parties were arrested except Richard Gravatt, who fled. A separate indictment also charged Defendants Joe King and Richard King in a related cash rental scheme. That case was tried before a jury and the undersigned in September 1999, resulting in convictions against both Defendants. Defendants Murray Evans and Scott Wallis pled guilty in the instant case, and Defendants John Dow and Frank Taylor pled guilty to related Informations charging tax evasion.

The indictment in the above-entitled matter was then superseded, adding Defendant Louis B. Oberhauser and additional charges concerning a subsequent conspiracy. Joe King and Richard King, subsequent to their convictions at trial, pled guilty to additional counts in the superseding indictment. Richard Gravatt was apprehended in the Los Angeles, California, area on or about December 10, 1999. As a result of his apprehension, the remaining Defendants, Richard Gravatt and Louis B. Oberhauser, were then tried before this Court and a jury during a six-week period of time in September and October, 2000. Defendant Richard Gravatt was convicted of 68 counts. Defendant Louis B. Oberhauser, as previously noted, was convicted of two counts.

Defendant Oberhauser was convicted of Count 53, a money laundering count concerning a $160,000 transfer into the Oberhauser & Neveaux IOLTA trust account in August 1996. On August 28, 1996, Richard King requested a transfer of $160,000 from a Group Resources, Inc., Sun Trust Bank Account in Cleveland, Tennessee, to the Oberhauser & Neveaux IOLTA trust account. With respect to Count 59, also money laundering, on November 25, 1996, $160,000 was transferred from the Oberhauser & Neveaux IOLTA trust account to a charitable organization known as ChildHelp.

For the benefit of his firm's client, G–3, Inc., Defendant Oberhauser set up the Oberhauser & Neveaux IOLTA trust account at Anchor Bank in Wayzata, Minnesota, on February 1, 1996. G–3 was an entity the directors of which included Defendants Murray Evans and Joe King. On February 5, 1996, Defendant Joe King requested that Defendant Oberhauser set up a trust account at Norwest Bank in place of the Anchor Bank account. Pursuant to Defendant Joe King's request, Defendant Oberhauser and his partner John Neveaux then set up an Oberhauser & Neveaux IOLTA trust account at Norwest Bank in Wayzata, Minnesota, on February 8, 1996, for the receipt and distribution of funds for their client, G–3, and its successor, K–7, Inc.

Also on February 8, 1996, Defendant Oberhauser sent Defendant Joe King a retainer letter stating, "I am very pleased that you have retained this firm to consult with you regarding corporate matters relating to G–3, Inc., and the distribution of funds." In the retainer agreement, Defendant Oberhauser states: "On behalf of G–3, Inc., I will accept wire transfers of funds into a designated depository account on G–3, Inc.'s behalf, and I will disburse these funds by check or wire transfer per written direction of Joe W. King or other parties properly authorized by corporate action and consented to in writing by a majority vote of the shareholders."

On February 12, 1996, Defendant Oberhauser faxed Defendant Joe King a memo regarding "instructions for wiring funds in [the] trust account," which contained information concerning the IOLTA trust account at Norwest Bank, Wayzata, Minnesota, including the bank's phone number, the trust account number, wiring instructions, and Barry Kelner and Rita Stevens as contact persons at Norwest Bank. G–3's directors then signed a corporate resolution providing that "the corporation desires to authorize a deposit of certain funds or instruments or other intangible property for the benefit of the corporation in the trust account of the law firm of Oberhauser & Neveaux ...." That corporate resolution authorized Defendant Joe King to direct that funds be deposited into the Oberhauser & Neveaux IOLTA trust account.

The Oberhauser & Neveaux IOLTA trust account at Norwest Bank in Wayzata, Minnesota, was primarily used by K–7, Inc. for the receipt of investor funds, rendering Oberhauser & Neveaux as an escrow agent. All Defendants, including Defendant Oberhauser, asserted throughout the trial that the investor funds were to be used for what they described as a legitimate T–Bill, or treasury bill, leasing program. The government maintained, from the inception of the indictment, that there was no proof of any legitimate or actual T–Bill leasing program. Based upon the evidence provided to the Court, it is the Court's view that there is no credible evidence to suggest that there was ever such a legitimate program or that any of the so-called documents supposedly verifying the program were authentic. Nonetheless, that was the purpose for which the IOLTA trust account was set up at Norwest Bank in Wayzata, Minnesota.

Between March 14, 1996 and October 28, 1996, 18 investors deposited a total of $3,511,000 into the trust account at Norwest Bank, Wayzata, Minnesota. These investor funds were to be placed in the promised leasing program. Each investor had a contract directly governing the terms and conditions for the use of these funds from the account.

In addition to the $3,511,000 in K–7 investor funds, the trust account also received four additional wire transfers, totaling $270,000: (1) from Group Resources, Inc., on August 28, 1996, for $160,000

(Count 53); (2) from P.L. Yang on May 19, 1997, for $60,000; (3) from Fargo Trust on December 11, 1997, for $25,000 (Count 85); and (4) from Cleveland Trust on December 11, 1997, for $25,000 (Count 86).

On October 17, 1996, Defendant Oberhauser transferred $600,000 to Adam Gaslowitz for an alleged "lease fee." On October 25, 1996, there was a $411,000 transfer out to K–7, Inc. for an alleged "partial set up fee." On October 29, 1996, there was a $2,400,000 transfer out to Tirzah Business Trust, which allegedly represented a John Dow Brokerage Commission. There was also a transfer on October 29, 1996, to K–7, Inc., for an alleged partial set up fee of $400,000. The above four transfers from the trust account totaled $3,511,000.

On May 19, 1997, P.L. Yang wire transferred $60,000 to the Oberhauser & Neveaux IOLTA trust account. The $60,000 was to be used at the direction of K–7 for so-called new replacement treasury bill documents, pursuant to an agreement that Defendant Oberhauser and K–7 had negotiated with an organization by the name of I.H.B. Even though it is the Court's conclusion that I.H.B. was not a legitimate organization, the fact is that K–7 then paid I.H.B. $60,000 that purportedly was going to help provide new replacement treasury bill documents. Defendant Oberhauser received directions from Defendant Joe King to wire the funds to I.H.B. as follows: "Please apply the $60,000 which was wired to your IOLTA trust account by Pei Lu Yang for the down payment of the lease of U.S. treasuries offered by Lynchburg and the contract to be signed by I.H.B. You have my authorization to wire such funds as requested by I.H.B." Defendant Oberhauser then sent a letter, dated May 28, 1997, to Norwest Bank, directing the transfer of $60,000 from Oberhauser & Neveaux Norwest trust account to I.H.B. The records before the Court do establish

that $60,000 was transferred in on May 19, 1997, and $60,000 was transferred out on May 29, 1997. However, there is no evidence in the record to suggest that Defendant Oberhauser had any basis to conclude that I.H.B. was anything other than a legitimate organization. Notably, none of the Defendants, to this day, would apparently share the Court's conclusion that I.H.B. was never established as a *bona fide* ongoing business entity as opposed to some type of shell corporation, with no assets whatsoever.

On December 9, 1997, Defendant Oberhauser requested that Defendant Joe King transfer $50,000 to his trust account so that he could complete a settlement that related to additional claims of I.H.B. for the so-called replacement treasury bills. Again, the Court notes "so-called" because the Court does not believe the evidence establishes the authenticity of any of these documents or the legitimacy of any of the transactions. Nonetheless, Defendant Oberhauser received into the trust account $25,000 from Fargo Trust and $25,000 from Cleveland Trust on December 11, 1997. On December 12, 1997, $50,000 was transferred from the Oberhauser & Neveaux trust account to I.H.B., and Defendant Oberhauser sent a letter with the wire transfer request which verified that it settled all claims between I.H.B. and K–7. Again, by referencing I.H.B., the Court does not suggest that the evidence established any such entity or replacement treasury bill transaction ever existed or occurred.

As noted previously, Defendant Oberhauser was convicted of Counts 53 and 59. With respect to Count 53, the trust account in question received a $160,000 wire transfer from Group Resources, Inc., on August 28, 1996. The wire transfer authorization lists the "requestor" as Richard King. The account name is identified as

"Group Resources, Inc." The transfer is directed to Barry Kelner/Rita Stevens, Norwest Bank Account # 3972985792 (the Oberhauser & Neveaux trust account). At trial, the parties disputed the purpose of the transfer. Defense expert Paul Walsh testified that, based upon his review of the documents, the transfer was "for charity." The government's position was that the evidence did not establish the precise purpose for the transfer, including whether there was any basis to conclude that the transfer was "for charity." Relatedly, the evidence established that on August 29, 1996, Group Resources, Inc., wire transferred $80,327.91 directly from their Sun Trust Account to a ChildHelp bank account, without utilizing the Oberhauser & Neveaux trust account.

There was evidence at the time of trial showing that Oberhauser & Neveaux had a K–7 file labeled "Charitable Activities." In the file, the contact person for ChildHelp was identified as Wayne Swindler. The "Charitable Activities" file included a fax from Defendant Oberhauser to Swindler on November 6, 1996, asking Mr. Swindler to: "Please review a letter of instruction, check numbers for correctness, and fax a signed copy back to my office. Thank you." Swindler approved the contents of the letter of instruction and faxed it back with the notation: "Okay. Wayne Swindler, CFO, ChildHelp." Defendant Oberhauser then signed the letter of instruction and, on November 25, 1996, Oberhauser & Neveaux authorized a wire transfer of $160,000 to ChildHelp at the

Western Bank, Encino, California. That transfer represented Count 59.

The parties, then and now, continue to dispute what the evidence and accounting shows with respect to the disposition of the $160,000 that was wired into the account on August 28, 1996 (Count 53), and the $160,000 that was wired out on November 25, 1996 (Count 59). The government maintained at trial that the August 28, 1996, wire transfer of $160,000 was used to make the $600,000 payment to Adam Gaslowitz on October 17, 1996. The Defendant, then and now, maintains that the $160,000 from Group Resources, Inc., was always for charity, specifically ChildHelp, and was not used for funding the treasury bill program. The Defendant argued, then and now, that a total of $1,011,000 of investors' funds was received into the IOLTA trust account between March 14, 1996, and June 7, 1996, and that the $160,000 wire transfer from Group Resources, Inc., on August 27, 1996, was not part of the $1,011,000. On October 17, 1996, Defendant Oberhauser transferred $600,000 to Adam Graslowitz for a purported initial "lease fee." The evidence establishes that there were funds in the account to cover the $600,000 lease payment fee and that the payment did not necessarily originate from or involve the $160,000 which had been received from Group Resources, Inc., on August 28, 1996, whether it was designated for ChildHelp or not.[1]

In addition to the $600,000 noted above that was paid out to Adam Gaslowitz on October 17, 1996, a so-called partial set-up fee was paid to K–7, Inc. on October 25,

---

1. The Defendant also has a motion for a new trial before the Court which presents as "new evidence" documents that were in the possession of the government and to which the Defendant had access but did not discover until after the trial. In his motion for a new trial, Defendant maintains that the documents clearly establish that the $160,000 was designated prior to its receipt as monies to fund a specific project of ChildHelp USA, namely the construction of a gymnasium in Belmont, California. These documents have not been considered by the Court, however, in reaching its decision on the Defendant's motion for judgment of acquittal.

1996 in the amount of $411,000. On October 28, 1996, the IOLTA trust account received $2,500,000 from Gordon Groves. The following day, those funds were disbursed by a $2,400,000 transfer to the so-called Tirzah Business Trust (the purported John Dow Brokerage Commission) and a $100,000 payment to K–7, Inc., as another purported partial set up fee. As it turns out, the investors' deposits of $1,011,00 matched the two disbursements in October 1996, prior to the $2,500,000 being received from Gordon Groves.

On November 25, 1996, Defendant Oberhauser transferred $160,000 (Count 59) to ChildHelp, pursuant to instructions and banking information the Defendant had previously received from ChildHelp, leaving the trust account with a nominal balance.

Both parties make much of the fact that the source of the funds for the $160,000 transfer to ChildHelp on November 25, 1996, is legally significant to the case. The government cites their exhibit that attempts to trace the funds (Government's Exhibit 379) while the Defendant cites his corresponding exhibit (Defendant's Exhibit 13). The government continues to assert that the October 28, 1996, transfer of $2.5 million from Gordon Groves (transferred by Sandro Sordi) funded the November 25, 1996, $160,000 ChildHelp contribution. The Defendant, in turn, continues to allege that that is entirely erroneous and that, rather, the $160,000 was designated for ChildHelp in August 1996, when it was received from Group Resources, Inc., and was therefore not impacted· by the $600,000 purported lease payment made to Adam Gaslowitz on October 17, 1996. While the Court concludes, separate from any exhibits it has been provided as part of the Defendant's new trial motion, that the direct and circumstantial evidence makes it more likely than not that the Defendant's accounting theory is more probably correct, it is the Court's view that the decision of this Court is the same, irrespective of which party has accurately described the evidence as to the source of the funds for the $160,000 payout to ChildHelp in November 1996. Regardless of the source of the funds with respect to Counts 53 and 59, and regardless of whether the $160,000 that was deposited in August is the same $160,000 that went out in November for ChildHelp, there is insufficient evidence for this Court to conclude and for a reasonable jury to have concluded, that when the transfers were made on August 28, 1996, and November 25, 1996 (Counts 53 and 59), the Defendant knew that the money represented the proceeds of some form of unlawful activity. Further, there is insufficient evidence for this Court to conclude, even when the evidence is viewed in the light most favorable to the government, that the Defendant had the intent to promote the carrying on of the specified unlawful activity—that is, wire fraud and mail fraud.

There was no evidence presented that Defendant Oberhauser had knowledge concerning the Group Resources, Inc., account or the source for deposits in the Group Resources, Inc., Sun Trust Bank account at the time he received the August 28, 1996, wire transfer of $160,000 (Count 53). Specifically, there was no evidence presented by the government that in August of 1996, Defendant Oberhauser had knowledge that K–7 was involved in a so-called T–Bill trading program beyond the K–7 investors who deposited funds in the Oberhauser & Neveaux IOLTA trust account. The evidence clearly does establish that the Group Resources, Inc., wire transfer of $160,000 in August 1996 was· composed of other investors' funds. However, there is no evidence to suggest that at that time, in August 1996, Defendant Oberhauser had any awareness, circumstantially or other-

wise, that the Group Resources, Inc., transfer was composed of investors' funds from another so-called leasing program. What the evidence does establish is that Defendant Oberhauser acquired such knowledge sometime in April 1997, if not before, however, not as early as fall 1996.

Unfortunately, perhaps for both parties, neither ChildHelp nor K–7's involvement in charities played a significant role in either the prosecution or the defense of the case. There was hardly any evidence presented with respect to either entity on this issue. There was no examination of any kind of Defendant Oberhauser with respect to the purpose or intent behind the transfers related to ChildHelp. (Counts 53 and 59.) That is not to suggest that Defendants Joe King and Gravatt did not utilize the lure and the aura of legitimacy that charitable contributions could bring to their scheme. Without speculating on the motives of either Defendants Joe King or Gravatt, ChildHelp plaques were displayed on the walls of K–7 and, not infrequently, investors heard from Defendants Joe King and Gravatt impassioned pleas about the commitment of both men and their organization to the charitable cause of ChildHelp. There is no question that the evidence confirms the testimony of the government's expert, Laura Shilling, that such representations, including representations that a percentage of profits would go to charity, gave "comfort" to investors and lulled them into a false sense of security.

The Defendant makes much of the argument that since no investor was aware of any plan to pay $160,000 to ChildHelp, then there was no evidence that anyone intended for this specific transaction to lure or lull the investors, thus promoting the scheme to defraud investors. The Court disagrees. If indeed the evidence established, which it did not, that Defendant Oberhauser knew that the charity representations with respect to ChildHelp were part of the overall fraud or scam, the government still had to prove that at the time the Defendant conducted the financial transactions—in this case, Counts 53 and 59–he knew the money represented the proceeds of some form of unlawful activity and that the financial transactions were conducted with the intent to promote the carrying on of the specified unlawful activity-that being, wire fraud and mail fraud. (*See* Jury Instructions, p. 29.) *United States v. Hildebrand,* 152 F.3d 756, 762 (8th Cir.1998); *United States v. Jolivet,* 224 F.3d 902, 909 (8th Cir.2000). For the reasons discussed below, the Court finds that there is insufficient evidence to establish that Defendant Oberhauser had any knowledge of illegality or intent to promote such illegality when conducting the two transactions involved in Counts 53 and 59.

### III. Motion for Judgment of Acquittal

#### A. Standard of Review

■ When considering a challenge to the sufficiency of the evidence to support a guilty verdict, the Court must view the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict. *See United States v. Maggard,* 156 F.3d 843, 846 (8th Cir.1998), *cert. denied sub nom. Maggard v. United States,* 525 U.S. 1170, 119 S.Ct. 1094, 143 L.Ed.2d 93 (1999), *and cert. denied,* 526 U.S. 1058, 119 S.Ct. 1372, 143 L.Ed.2d 532 (1999).

■■ In *United States v.. Chavez,* 230 F.3d 1089, 1091 (8th Cir.2000), the Eighth Circuit articulated unequivocally the standard for a trial court's consideration of a motion for judgment of acquittal:

> In ruling on a motion for acquittal, the role of the district court is not to weigh evidence or consider the credibility of

the witnesses, but rather to determine whether the Government has presented evidence on each element sufficient to support a jury verdict. *See Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *United States v. Bredell*, 884 F.2d 1081, 1082 (8th Cir. 1989). Questions of credibility are the province of the jury. *See United States v. Fuller*, 942 F.2d 454, 458 (8th Cir. 1991).

■ The Court is not unmindful that any attack on the sufficiency of the evidence is to be viewed very strictly and, of course, "the verdict of the jury should not be overturned lightly." *United States v. Burks*, 934 F.2d 148, 151 (8th Cir.1991).

## B. The Elements of Money Laundering

■ Both parties agree that the crime of money laundering as charged in Counts 53 and 59 has four essential elements. As the Court instructed the jury at the end of trial, the elements are as follows: (1) On or about the dates identified in the indictment the defendants conducted financial transactions which affected interstate commerce; (2) the defendants conducted the financial transactions with money that involved the proceeds of the specified unlawful activity, that is wire fraud and mail fraud; (3) at the time the defendants conducted the financial transactions, the defendants knew the money represented the proceeds of some form of unlawful activity; and (4) the defendants conducted the financial transactions with the intent to promote the carrying on of the specified unlawful activity, that is wire fraud and mail fraud.

■ There is no evidence in the record to suggest that the Defendant knew that the money represented the proceeds of some form of unlawful activity when the $160,000 transfer from Group Resources,

Inc., was made on August 28, 1996. Moreover, even when the evidence is viewed in the light most favorable to the verdicts and the Court accepts, as established, all reasonable inferences supporting the verdicts, the government simply did not prove that at the time of each financial transaction associated with Counts 53 and 59, that the Defendant knew that the money represented the proceeds of some form of unlawful activity. Admittedly, there is circumstantial evidence in the case to conclude otherwise, starting in April 1997. However, these transactions occurred in August 1996 and November 1996. Moreover, both transfers occurred so early in the fraudulent scheme that there is no basis by which the government can argue that Defendant Oberhauser turned a blind eye or otherwise deliberately avoided criminal knowledge. There is no doubt that Defendant Oberhauser's role changed after all funds were disbursed and various problems were encountered with the program. It was only then that investors started to press and question Defendants Joe King and Gravatt, and it was then that Defendants Joe King and Gravatt insisted that Defendant Oberhauser take on a different role. Consequently, the Defendant's level of knowledge was quite different, beginning in the early part of 1997, specifically in April 1977, than it was from August through November, 1996.

Again, even when evaluating the evidence in the light most favorable to the verdict and accepting, as established, all reasonable inferences supporting the verdict with respect to Counts 53 and 59, there is no evidence that either the $160,000 deposit into or the transfer out of Defendant Oberhauser's trust account promoted the underlying criminal activity in any way. There is no evidence to suggest that either transfer was to be reinvested

back into the underlying fraud scheme or that the transaction in any way actually promoted the underlying fraud scheme. No evidence was presented that any investor knew about the wire transfer in November 1996, that K–7 touted the transfer in any way to influence investors, or that it was otherwise manipulated or referred to, whether directly or indirectly, in an attempt to promote the underlying scheme or to solicit prospective investors.

■■■■ Certainly, the government does not have to trace the funds to prove a violation of § 1956. *United States v. Pennington*, 168 F.3d 1060 (8th Cir.1999). However, the government is required to show more than that a particular financial transaction promoted the underlying criminal activity. Even assuming, for purposes of the Court's evaluation, that the transfers in August and November 1996 unwittingly or otherwise promoted the underlying criminal activity, the government still must prove that the Defendant intended to promote the underlying criminal activity to sustain a conviction under the promotional prong of the law. *United States v. Nattier*, 127 F.3d 655 (8th Cir.1997). There is insufficient evidence that the two transfers in question were financial transactions conducted "with the intent to promote the carrying on of specified unlawful activity." The position of the government largely ignores the intent aspect of the promotion element. Section 1956(a)(1)(A)(i) is not satisfied by a showing that a financial transaction involving the proceeds of specified unlawful activity merely promoted the carrying on of unlawful activity. That provision has an intent element that must be satisfied so that evidence of intentional promotion must be present. Otherwise, the money laundering statute for the Court could be transformed into a "money spending" statute any time money was expended or deposited. *United States v.*

*Jolivet*, 224 F.3d 902 (8th Cir.2000); *United States v. Nattier*, 127 F.3d 655 (8th Cir.1997). *See also* Money Laundering: Federal Prosecution Manual, Chapter 3 (U.S. Department of Justice, 1993); Eighth Circuit Manual of Model Jury Instructions: Criminal, § 6.18.1956A, Committee Comments and Notes on Use (2000).

■■■■ With respect to the aiding and abetting portion of the indictment, Defendant Oberhauser's mere association with the Defendants, particularly Defendants Joe King and Gravatt is legally insufficient to sustain an aiding and abetting conviction, absent some type of affirmative or intentional participation in the transactions. There is insufficient evidence to support the conclusion that the $160,000 transfer into the IOLTA trust account in August 1996 and $160,000 transfer out in November 1996 to ChildHelp promoted the specified unlawful activity or that the Defendant intentionally promoted the carrying on of the unlawful activity.

While the Court rejects the Defendant's characterization of these transactions as benign expenditures, the evidence before the Court is wholly insufficient to permit a jury to have drawn a reasonable inference of guilty knowledge and intent. The government is, of course, allowed to rely on circumstantial evidence, but that circumstantial evidence must go beyond speculation and conjecture.

Most of the evidence cited by the government occurred after the ChildHelp transactions in 1996. Even though this Court is not prohibited from considering that evidence simply because the Defendant was acquitted of all other charges, there is no evidence in the record, subsequent to the transactions in August and November 1996, that would prove, circumstantially or otherwise, that Defendant Oberhauser knew of any specified unlawful

activity with respect to Counts 53 and 59 in August of 1996, in November of 1996, or that he acted with intent to promote the carrying on of that illegal activity. *United States v. Herron*, 97 F.3d 234 (8th Cir. 1996); *United States v. Rockelman*, 49 F.3d 418 (8th Cir.1995).

With respect to Counts 53 and 59, given the nature of the transactions and when they occurred, based upon the evidence that the jury heard in this case and that this Court has carefully scrutinized, one can easily see how the jury, amongst 66 counts in a complaint and a joint trial, struggled with money transfers where there were no partial participation agreements and no clear cut language in the IOLTA agreement that would explain the transactions, particularly when the $160,000 ended up in the hands of a legitimate charity organization vis-a-vis Defendants Joe King and Gravatt. While this Court will not speculate about the verdicts reached in Counts 53 and 59, they might well be characterized as breach of contract counts (trust account), in light of the evidence, to the extent they represent transactions where investors did not directly pay into the Defendant's IOLTA account. However, the Court does not have to assume anything in order to conclude that the evidence is woefully insufficient with respect to the elements of promotional money laundering in Counts 53 and 59. Contrary to the position of the government, mere acceptance of funds into the IOLTA trust account is insufficient for conviction of promotional money laundering. Even if the Court were to accept the government's argument that there was some type of implied, if not explicit, restriction on the IOLTA account that would restrict Defendant Oberhauser's receipt of funds from Group Resources, Inc., for the benefit of ChildHelp, accepting a wire transfer does not demonstrate criminal intent and criminal knowledge when Defen-

dant Oberhauser did not control the deposits going into the account. Thus, even if the Defendant violated the terms of the IOLTA trust agreement by "accepting" a wire transfer into the account, that is not tantamount to showing criminal intent. Whether the Defendant was a lawyer or not, his responsibility was not to evaluate and determine the source of deposits into the account. Defendant Oberhauser received the transfers into the IOLTA trust account and disbursed them to third parties consistent with instructions from his client. With or without a breach-technical or otherwise-of the IOLTA trust agreement, the government failed to prove that Defendant Oberhauser intended to promote the underlying fraudulent scheme by facilitating a transfer of funds into the IOLTA trust account (Count 53) or facilitating a transfer of funds out of the IOLTA trust account to charity (Count 59).

And, contrary to the Defendant's position in the case, the Defendant's role as a lawyer played no part in the Court's evaluation of the evidence. In fact, the only difficulty the Court has with this decision is the fact that it may send the wrong message to a Defendant who happens to be an attorney who has denigrated the profession by his behavior. It is bothersome to the Court that Defendant Oberhauser insisted throughout the trial that: "I am not a securities lawyer, I am a corporate lawyer," yet he never passed that wisdom, which is really an admission of ignorance, on to any of the investors, even after the fact. Quite tragically for the legal profession and its reputation, while there was no evidence that the Defendant profited from any of these transactions except for his hourly legal fees, it appears that the Defendant's greed and/or access to easy hourly fees motivated his behavior. At least in April 1997, if not before, the Defendant should have dis-

closed that he was not a securities lawyer, but rather a corporate lawyer who knew nothing about any so-called T–Bill leasing program. It is that behavior that damages and disgraces the legal profession.

The Defendant's conduct in the Monarch transaction, which was not charged, and Defendant's general behavior of playing the victim in the case, is offensive to the Court and brings disrepute to the legal profession. The Monarch transaction involved a $1.9 million promissory note presented by Defendant to be signed by Scott Wallis and ultimately used to inflate the balance of the trust account to reach the threshold for distributions as established in the investors' partial participation agreements. While such conduct may well have violated the partial participation agreements and even assuming that to be the case, such violations resonate with breach of contract and/or fiduciary duties rather than criminal intent, and the Court's evaluation of the sufficiency of the evidence remains the same. The fact remains that there is insufficient evidence in the record to prove that Defendant Oberhauser conducted the two financial transactions in question, knowing that the money represented the proceeds of some form of unlawful activity, or that he conducted those transactions with the intent to promote the carrying on of the specified unlawful activity-that is, wire fraud and mail fraud.

Quite amazingly, from the Court's point of view, but consistent with the evidence in the case, a Co–Defendant in the case and primary witness for the government, whom the Court and the government found to be truthful-Scott Wallis-testified under oath that as late as early 1998, he did not believe that he was involved in a scam or fraudulent scheme. Yet, the government suggests that somehow Defendant Oberhauser knew of the unlawful ac-

tivity and the scheme as early as August and November 1996. The Court disagrees for the reasons stated.

If the Court had concluded that there was sufficient evidence in the record to support the jury verdicts as to Counts 53 and 59, which it has not, it is worth noting that the Defendant's role and capacity as a lawyer would not have shielded him from criminal responsibility. The Court does not need to reach the issue as it relates to Counts 53 and 59 as to whether Defendant Oberhauser handled the IOLTA trust account and these two transfers consistent with his ethical and legal responsibilities. If the evidence was otherwise sufficient, his role as a lawyer would not provide a defense or a shield from responsibility. There are perhaps a variety of reasons, based upon the evidence, why Defendants Joe King and Gravatt involved a lawyer, in this case Defendant Oberhauser, into the schemes established by the evidence. Whether the purpose was to provide them a shield, to establish a middle man, or to somehow lull investors into a prolonged false sense of security, does not nullify the government's responsibility to prove all elements of money laundering, including criminal intent.

The jury in this case was certainly dedicated and reasonable-minded. However, the Court concludes, for the reasons stated, that the jury must have entertained reasonable doubt as to the government's proof of at least two of the essential elements in Counts 53 and 59, even when the evidence is viewed in the light most favorable to those verdicts and when the Court accepts all reasonable inferences supporting the verdicts. *United States v. Kinshaw*, 71 F.3d 268 (8th Cir.1995); *United States v. Nunn*, 940 F.2d 1128 (8th Cir. 1991).

For the reasons stated, Defendant Louis B. Oberhauser's motion for a judgment of

acquittal is granted. It is a rare case indeed, when a judge should grant such a motion after a six-week trial. However, this is such a case.

## IV. Motion for a New Trial

Defendant Louis B. Oberhauser has moved the Court, pursuant to Fed. R.Crim.P. 33 for a new trial on four separate grounds: (1) error in giving a "willful blindness" instruction relating to Counts 53 and 59; (2) prejudicial joinder with Co-Defendant Gravatt; (3) the interests of justice; and (4) newly discovered evidence.

With respect to the Defendant's motion for a new trial based upon the Court's decision to give a "willful blindness" instruction and the Court's decision to join for trial Defendants Louis B. Oberhauser and Richard C. Gravatt, the Court stands by its prior rulings in this case and therefore denies Defendant's motion for a new trial on either or both grounds.

■■■ The Defendant has also moved the Court for a new trial in the interests of justice, alleging that the verdicts are against the weight of the evidence. Rule 33 of the Federal Rules of Criminal Procedure provides that a trial court may order a new trial in the "interests of justice" in cases where the jury's verdict is against the weight of the evidence. Unlike a motion for a judgment of acquittal, in reviewing a motion for a new trial, pursuant to Rule 33, the Court is not required to view the evidence in the light most favorable to the government. *United States v. Brown,* 956 F.2d 782 (8th Cir.1992); *United States v. Davis,* 103 F.3d 660 (8th Cir.1996); *United States v. Lincoln,* 630 F.2d 1313 (8th Cir.1980).

■■■ Again, this authority should be exercised sparingly and with caution. *Lincoln,* 630 F.2d at 1319. With due and appropriate deference to the jury's verdict

on Counts 53 and 59, and for the reasons stated in the Memorandum with respect to the Court's granting the Defendant's motion for a judgment of acquittal, the Court finds and concludes that those verdicts are contrary to the weight of the evidence. That is particularly the case when the newly discovered evidence, consisting of nine documents, is considered. All nine documents relate to the transactions addressed in Counts 53 and 59.

The nine newly discovered documents are as follows:

(1) August 27, 1996, letter from Joe King to Defendant Oberhauser;

(2) Facsimile transmittal cover sheet accompanying the August 27, 1996, letter;

(3) Facsimile transmittal cover sheet accompanying the August 27, 1996, Joe King letter faxed directly by K–7 to the ChildHelp Arizona office;

(4) Memo dated March 13, 1996, from Joe King to Richard King;

(5) Defendant Oberhauser's letter to ChildHelp at the Arizona address and Arizona facsimile number dated August 28, 1996;

(6) Facsimile transmittal cover sheet by Defendant Oberhauser to ChildHelp on August 29, 1996;

(7) A ChildHelp internal document dated August 23, 1996;

(8) A ChildHelp internal document confirming receipt of $160,000 wire transfer from Oberhauser & Neveaux dated November 25, 1996; and

(9) A ChildHelp internal document dated March 18, 1996.

■■■ A motion for a new trial based on newly discovered evidence must satisfy the following five requirements: (1) the evidence must be, in fact, newly discovered, that is discovered since the trial; (2) facts must be alleged from which the court may infer diligence on the part of the

movant; (3) the evidence relied upon must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) it must be of such a nature that, on a new trial, the newly discovered evidence would probably produce an acquittal. *United States v. Liebo,* 923 F.2d 1308, 1313 (8th Cir.1991); *see also United States v. LaFuente,* 991 F.2d 1406, 1408 (8th Cir.1993); *United States v. Begnaud,* 848 F.2d 111, 113 (8th Cir.1988). A motion for a new trial based on newly discovered evidence should be considered cautiously, and the trial court has broad discretion in deciding whether to grant or deny the motion. *See Liebo,* 923 F.2d at 1313.

First of all, the newly discovered evidence consists, as noted above, of nine documents. Those documents were in the government discovery and were accessible to defense counsel prior to and during the trial. The Court assumes that neither the defense nor the government reviewed these documents until after the jury's verdict. Some of these documents were part of the estimated 25,000 pages of documents copied by the defense from the government's discovery of approximately 350,-000–400,000 pages of documents seized or subpoenaed. Other documents were not copied or reviewed until January 30, 2001, according to the affidavit of defense counsel, William J. Mauzy.

It is the Court's view that both parties proceeded in good faith. The fact that some of these documents may have been overlooked or misfiled, and therefore not reviewed, is understandable. The failure to discover the documents was not due to lack of diligence. Certainly, the new documents are material to the verdicts reached in the case with respect to Counts 53 and 59. The new documents are not entirely cumulative, although they are not nearly as significant as asserted by the defense in its memorandum to the Court. Of more significance to the Court is the fact that, given the Court's analysis of the insufficiency of the evidence, when the new evidence is viewed in light of the entire record made at trial, the new evidence is sufficient to create a reasonable doubt. Thus, the Court concludes that the Defendant has satisfied all of the elements of the *Liebo* test because the new evidence, when viewed in the context of the entire record, would more likely than not have created sufficient reasonable doubt to produce acquittals on Counts 53 and 59.

Therefore, consistent with Rule 29(d) of the Federal Rules of Criminal Procedure and for the reasons set forth in the Memorandum of this Court, the Court conditionally grants the Rule 33 motion of Defendant Louis B. Oberhauser for a new trial in the event that the Court's decision granting the judgment of acquittal is vacated or reversed on appeal. Since the motion for a new trial has been granted conditionally, if the judgment of acquittal is reversed on appeal, the new trial shall proceed unless otherwise ordered by the appellate court. Subsequent proceedings shall be in accordance with the order of the appellate court, consistent with Rule 29(d).