**UNITED STATES of America, Appellee,**

v.

**Lloyd G. RATLIFF, Appellant.**

**No. 88–2830.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1989.

Decided Jan. 3, 1990.

Rehearing and Rehearing En Banc Denied Feb. 21, 1990.

Joseph Andrew Walker, Bridgeton, Mo., for appellant.

Michael W. Reap, St. Louis, Mo., for appellee.

Before LAY, Chief Judge, and BOWMAN, and MAGILL, Circuit Judges.

BOWMAN, Circuit Judge.

Appellant Lloyd G. Ratliff was convicted by a jury of six counts of violating the National Stolen Property Act, 18 U.S.C. § 2314 (1982). Section 2314 prohibits the interstate transportation of money or property with a value in excess of $5,000 if the money or property was procured by a scheme or artifice to defraud. Appellant argues that his conviction should be reversed because (1) the government failed to prove the jurisdictional amount on Counts III and V; (2) the government failed to prove fraud or intent to deceive on Counts I, II, IV, and VI; and (3) the District Court erred in allowing the government to introduce evidence regarding other crimes committed by the defendant. We affirm the judgment of the District Court.[1]

I.

Ratliff was found guilty of fraudulently procuring a total of $84,000 from six investors. The schemes used to defraud each of the victims were essentially the same. Beginning in 1980 and continuing until October 1983, appellant solicited or caused to be solicited investors for coal ventures managed and operated by Donnie Webb. Ratliff directed investors to place their money into an interest-bearing certificate of deposit (CD) purchased from Colonial Bank in Des Peres, Missouri. The CD was typically in both Ratliff's and the investor's names. Appellant warranted to the investors that the CD was to be pledged as collateral for a loan, the proceeds of which would be transferred to Webb for the purchase of spot coal contracts. The profits received from the resale of the coal contracts were to be distributed to the holders of the CDs. The investors were told they would receive interest on the CDs as well as substantial profits from the coal ventures.

The government's evidence showed that Webb did not use the investors' money to purchase spot coal contracts. Instead, Webb, purporting the money to be profit, returned to Ratliff the money that came in from new investors and Ratliff distributed it to the earlier investors. In this way the investors were deceived into believing they were receiving profits from their investments when in fact they were receiving only a portion of the principal amount of someone's investment in the fraudulent

---

1. The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

scheme. On occasion, appellant would not even forward an investor's check to Webb but, on Webb's instruction, would distribute proceeds of the check directly to investors. Ratliff asserts that he would dispose of new funds in this manner only after having received assurances from Webb that Webb was about to forward a check representing proceeds from the coal venture in an amount equal to or greater than the new investor's check. Ratliff testified at trial, however, that he never asked for or received any documentation from Webb reflecting the existence of any spot coal contracts purchased with investors' money.

In addition to demonstrating that the investment scheme was a fraud, the government's evidence established that Ratliff transported the investors' funds across state lines. Because the scheme spanned several years and entangled a number of victims, the chronology of the transfers resists precise description. The general pattern, however, was that appellant would use the investors' checks to purchase CDs from banks in Missouri, these CDs then would be hypothecated for loans from banks also in Missouri, and the money from the loans would be transferred to a bank in Arkansas. Ratliff generally drew checks to investors and to creditor banks either directly from the Arkansas accounts or from a Kemper Money Market Account in Missouri, which he funded with wire transfers from the Arkansas Banks. As the loans against the CDs began coming due and new investors could not be found to keep the scheme afloat, appellant used the CDs to pay off the loans, and thus the victims of the fraudulent scheme lost all the principal they had invested in it.

## II.

Appellant's first argument is that the government failed to prove that the value of the transported property in Counts III and V exceeded $5,000.

We review the evidence supporting the jury verdict in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and credit all reasonable inferences that accrue to the benefit of the government. *United States v. Ellison*, 793 F.2d 942, 949 (8th Cir.), *cert. denied*, 479 U.S. 937, 107 S.Ct. 415, 93 L.Ed.2d 366 (1986). We believe the jury had sufficient evidence to conclude that on each of these two counts the value of the fraudulently obtained property transported in interstate commerce exceeded $5,000.

The property involved in both counts was cashier's checks. In each instance, a CD with a value of $20,000 had been pledged as collateral on a $20,000 loan at a bank in Missouri. Ratliff used $40,000 of investor funds to pay off these two loans and release the CDs. Appellant then exchanged the CDs for two $20,000 cashier's checks and transported the checks to Arkansas, where he deposited them into an account in his name in an Arkansas bank. He then used the proceeds of the checks to pay other investors, creating the illusion that the payment was profit from the sale of spot coal contracts.

Ratliff makes the rather startling argument that, because the CDs purchased with the checks of the victim investors in Counts III and V were not used to pay off the loans for which they were hypothecated, the interstate transportation of the money in those CDs did not involve money obtained by fraud. That is, appellant states that in each case $20,000 from "unidentified sources"—rather than the pledged CDs—was used to settle the loans and that if he had allowed the creditor banks to claim against the victims' pledged CDs he could have used the unidentified $20,000 in each case to purchase the same CDs in Arkansas that he purchased with the victims' CDs. Had he done so, he argues, the $20,000 involved in each count would not have been fraudulently obtained, unless it were proved that the "unidentified source" was yet another victim of Ratliff's con game (which seems likely to us to have been the case).

Be that as it may, appellant did not use the money from the "unidentified source" to open CDs in Arkansas; he used those funds to pay off bank loans in Missouri and then transported the money in the victim

investors' CDs across state lines. The jury found that this money, well over $5,000 in both cases, was obtained from the investors by fraud. Based on the evidence, the conclusion reached by the jury is entirely reasonable.

### III.

■ Ratliff next argues that his motion for judgment of acquittal on Counts I, II, IV, and VI should have been granted because the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he committed fraud or that he intended to deceive. The evidence of fraud at trial, however, was substantial. Indeed, appellant admits that "[o]n the narrow individual acts relating to the incidents in Counts I, II, IV, and VI, the government carried its burden." Appellant's Brief at 11. He goes on to contest only that there was sufficient evidence for a jury to find that appellant "had the slightest reason to suspect that Webb was committing fraud, or stealing." Appellant's Brief at 12.

Whether Ratliff "was at least not unjustified in relying on Webb's honesty," as appellant claims, Appellant's Brief at 12, or whether such reliance was unjustified and perhaps nonexistent, however, is a question for the jury. And as with Ratliff's first argument, "we must examine the evidence in a light most favorable to the government, giving it the benefit of all reasonable inferences," and will reverse only if we conclude that a reasonable jury could not have found appellant guilty beyond a reasonable doubt. *United States v. Davis,* 785 F.2d 610, 619 (8th Cir.1986). Again, not only was the evidence of Ratliff's mens

rea vast,[2] but his own admissions on this point must conclude our review. Ratliff states that "the acts upon which the four counts were based could be innocuous, or fraudulent." Appellant's Brief at 13. The jurors viewed appellant's acts as fraudulent based on sufficient evidence and we will not countermand their verdict.[3]

### IV.

■ Ratliff's final argument is that the District Court abused its discretion by admitting into evidence testimony of an investor who was not involved in any of the six counts of fraud charged. Appellant argues that the testimony was inadmissible character evidence and did not tend to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). He further argues that the testimony is inadmissible under Federal Rule of Evidence 403 because "its probative value is substantially outweighed by the danger of unfair prejudice." We disagree.

Although evidence of other crimes or wrongful acts by a defendant is inadmissible if offered to prove propensity, such evidence is admissible to prove that the defendant acted knowingly or intentionally or as evidence of a common scheme or plan. Fed.R.Evid. 404(b). The trial court is given broad discretion in determining whether to admit evidence of similar wrongful acts and "reversal is only commanded when 'it is clear that the questioned evidence has no bearing upon any of the issues included.'" *United States v. Marshall,* 683 F.2d 1212, 1215 (8th Cir. 1982).

---

**2.** Ratliff is a college graduate. At the time of the transactions relevant to this case, he had a license to sell securities and had been in the securities business for many years. The evidence presented at trial shows that appellant regularly commingled investors' funds and on several occasions paid investors with subsequent investors' money, falsely representing that the payments were profits from investments in the spot-coal market. In addition, Ratliff aggressively solicited investments for the apocryphal coal venture even though he had seen absolutely no documentation demonstrating either its legitimacy, its risks, or its likelihood of profit to the investors.

**3.** Although Ratliff raises no objection to the jury instructions, we note that the trial judge instructed the jury fully on the issue of intent. Tr. at 5–70 to –73. Thus, among other things, the judge explained: "The crimes charged in the indictment in this case are crimes which require proof of specific intent before a Defendant can be convicted.... And to establish specific intent, the Government must prove that this Defendant knowingly did an act which the law forbids purposely intending to violate the law." Tr. at 5–72.

The testimony of the witness concerns Ratliff's conduct in operating the very scheme for which he was on trial. The investor testified that appellant persuaded her to invest $20,000 in the coal venture scheme. Ratliff used the witness investment to purchase a $20,000 CD at a Missouri bank and hypothecated the CD for a $20,000 loan to be invested in spot coal contracts. Appellant later transferred her CD to an Arkansas bank without her knowledge or permission. Although Ratliff promised the investor that she would receive the interest on her CD and a profit on her investment in the coal contracts, she wound up losing her entire $20,000.

That this particular investor was not one of the investors named as a victim in any of the counts of the indictment does not detract from its value as evidence of appellant's stratagem. The evidence is relevant to show Ratliff's knowledge and intent as well as to show the existence of a plan or scheme to defraud. We therefore conclude that the District Court did not abuse its discretion in ruling that the testimony of this investor was admissible under Rule 404(b) or in finding that its probative value outweighed the danger of unfair prejudice under Rule 403.

Finding no reason for reversal, we affirm the judgment of the District Court.