# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2886

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Catherine A. Jolivet, | * | |
| also known as Catherine A. Vaho, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 9, 2000

Filed: September 22, 2000

_____

Before RICHARD S. ARNOLD and HEANEY, Circuit Judges, and MAGNUSON[1],
    District Judge.

_____

HEANEY, Circuit Judge.

Following a jury trial, Catherine A. Jolivet was convicted of four counts of mail
fraud, in violation of 18 U.S.C. §§ 2 and 1341; three counts of money laundering, in

_____

[1]The Honorable Paul A. Magnuson, Chief Judge, United States District Court
for the District of Minnesota, sitting by designation.

violation of 18 U.S.C. §§ 2 and 1956(a)(1)(A)(i); and one count of conspiracy, in violation of 18 U.S.C. § 371. She was sentenced to thirty-six months' imprisonment on all charges, with the sentences to run concurrently. On appeal, she argues that the district court plainly erred in admitting expert testimony from the government's handwriting analyst, and that the district court abused its discretion by denying her a continuance. She further argues that the evidence was insufficient to sustain any of the convictions. We affirm in part and reverse in part.

## FACTS

Jolivet's charges stemmed from four insurance schemes, all of which were perpetrated in the same manner by Jolivet and her husband, Jeremi-Jo Vaho. Jolivet, Vaho, or another party would obtain insurance. Sometime thereafter, the insured (or someone claiming to be the insured) would contact the insurance company, claiming to have caused an automobile accident.

The government produced evidence that none of these accidents actually happened. Rather, each of the "victims" was a fictitious person created by Vaho. Vaho would represent to the insurance companies that he and his fictitious family were the accident victims, and would then submit false expenses and medical records. Among the items submitted to the insurance companies were checks and money orders indicating that they were being used to pay for medical expenses. None of these instruments were used to pay these expenses, but had been altered to effectuate the fraudulent scheme. Many of these documents were signed by Jolivet.

After providing the insurance company with fraudulent documentation of the injuries and expenses from the accident, Vaho would settle the insurance claims on behalf of himself and his fictitious family. The settlement proceeds were often deposited in one of Jolivet's bank accounts.

**DISCUSSION**

## I. EXPERT TESTIMONY

Jolivet complains that the district court erred in admitting the testimony of Donald Lock. Lock, proffered as an expert in handwriting comparison, analyzed a large number of documents at trial to determine if Jolivet was the signatory on the documents. After comparing the questioned documents with other documents that were known to contain Jolivet's signature, he opined that the signatory on the questioned documents was likely Jolivet, but he would not state that he was absolutely certain of his conclusions.

In order to be admissible, expert testimony must be both relevant and reliable. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). The district court is afforded wide latitude in making its reliability and relevance determinations. See id. at 152.

We usually review the district court's expert testimony determinations for an abuse of discretion. See id. at 141-42. However, in this case our review is further limited because Jolivet did not object to the admission of Lock's testimony at trial. "Without a timely, contemporaneous objection at trial, a party cannot preserve an issue for appeal, and this court cannot reverse on appeal unless we find 'plain error.'" United States v. Martin, 869 F.2d 1118, 1121 (8th Cir. 1989) (quoting United States v. Roenigk, 810 F.2d 809, 815 (8th Cir. 1987)) (citation omitted).

Because Lock was particularly well-qualified in analyzing questioned documents--having studied and taught internationally, written manuals, and practiced in the field for over two decades, performing several thousand comparisons--the district court did not abuse its discretion in finding Lock's expert testimony to be reliable. See United States v. Paul, 175 F.3d 906, 910-11 (11th Cir. 1999). Similarly, in light of

3

Lock's experience and expertise, we believe his testimony may be properly characterized as offering the jury knowledge beyond their own and enhancing their understanding of the evidence before them. See id. at 911. The district court thus committed no abuse of discretion, much less plain error, in admitting Lock's testimony.

## II. MOTIONS FOR A CONTINUANCE

Jolivet next argues that the district court erred in denying two of her motions for a continuance. According to Jolivet, her counsel had insufficient time to prepare for trial and therefore did not adequately represent her. We review for an abuse of discretion, mindful that continuances "generally are not favored and should be granted only when the party requesting one has shown a compelling reason." United States v. Cotroneo, 89 F.3d 510, 514 (8th Cir. 1996).

Jolivet's trial was originally scheduled for January 4, 1999. In late December of 1998, Jolivet's attorney filed a motion to withdraw as counsel. The district court granted the motion, appointed new counsel, and continued the trial until February 8, 1999.

Apparently unaware that the court had already ruled on the issue, Jolivet subsequently filed a pro se motion asking that her trial remain scheduled for January 4. As she stated in her motion, any request for a further continuance was a strategy employed by the government to "drag [the case] as long as it takes for Defendant to grow weak and frustrated enough to agree to a plea offer." (App. at 76.) Informing the court that she was "ready to proceed to trial," Jolivet stated that she "would like to see trial proceed as scheduled on January 4, 1999." (Id.)

Despite Jolivet's request, the trial remained set for February 8. On January 19, Jolivet's attorney requested a continuance because he would be in trial in state court on February 8. The district court denied the motion, noting Jolivet's recent request for

4

a speedy resolution. On January 27, counsel renewed his motion, this time because Jolivet had a scheduling conflict on February 8. The district court denied this motion as well.

In light of Jolivet's own requests for an expeditious disposition, it was not an abuse of discretion for the district court to deny further continuances. Moreover, in neither motion did counsel suggest that absent a continuance he would have insufficient time to adequately prepare for trial, the ground Jolivet now relies upon for reversal on appeal. As this issue was not properly presented to the district court, our review is limited to plain error and we find none. See Fed. R. Crim. P. 52(b); accord Parkus v. Delo, 135 F.3d 1232, 1234 (8th Cir. 1998) (analyzing appellant's objection to jury instructions under plain error standard where appellant raised different grounds before district and appellate courts).

## III.    SUFFICIENCY OF THE EVIDENCE

Jolivet further challenges her convictions, contending that the evidence adduced at trial was insufficient to support any of them. We view the evidence in the light most favorable to the verdict, accepting as established all reasonable inferences the evidence tends to prove. See United States v. Hawkey, 148 F.3d 920, 923 (8th Cir. 1998). While the government is obligated to prove every element of the offenses, see United States v. Hildebrand, 152 F.3d 756, 761 (8th Cir. 1998), the evidence "need not exclude every reasonable hypothesis of innocence, but simply be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty," Hawkey, 148 F.3d at 923 (quoting United States v. McGuire, 45 F.3d 1177, 1186 (8th Cir. 1995)).

A.    Mail Fraud

Jolivet was convicted of four counts of mail fraud stemming from two insurance schemes. In order to sustain a conviction for mail fraud, the government must show that the defendant knowingly participated in a scheme to defraud, and that it was reasonably foreseeable that the mails would be used to effectuate the scheme. See Hildebrand, 152 F.3d at 761. The use of mails need not be essential to the scheme; a conviction may be sustained even if the use of mails was merely incidental to the scheme. See United States v. Nelson, 988 F.2d 798, 804 (8th Cir. 1993). Moreover, it is not necessary that the defendant herself use the mails, so long as she caused the mails to be used in furtherance of her scheme. See id.; accord Hildebrand, 152 F.3d at 761 ("[E]ach participant in a scheme to defraud is responsible for his partners' use of the mails in furtherance of that scheme.")

Jolivet does not deny the existence of either scheme to defraud, or that it was foreseeable that the mails were used to further the schemes. Rather, she argues that she did not knowingly participate in the plan. In order to consider her claims, we must further detail the facts surrounding each plot.

1.    The Norwood Claim

In early January of 1994, Anicet Penoukou–a confederate of Jolivet and Vaho's–reported that while driving a rental car, he was involved in an at-fault accident in which he hit Martin Norwood'vehicle. Martin Norwood was a fictitious character portrayed by Vaho.

The rental car was insured by The Travelers Insurance Company (Travelers). Travelers contacted Vaho (whom Travelers believed to be Norwood) regarding the accident. Vaho stated that he was involved in the accident, that his car had been damaged and repaired, and that he and his family were receiving medical treatment.

6

Vaho indicated that his address was 4347 S. Weller, Apt. 79, in Springfield, Missouri-- Jolivet's address. Travelers subsequently sent a letter to this address, asking Vaho to detail the accident.

In June, someone again posing as Norwood mailed copies of medical records, invoices, and copies of checks and money orders to Travelers in support of the Norwood claim. Again, Travelers was informed that the Norwoods' address was the very address at which Jolivet was living. Moreover, all of the documentation supporting the claim--the medical records, invoices, checks and money orders--had all been altered so as to appear to relate to the Norwoods' claim. Some of the altered checks and money orders bore Jolivet's signature.

    2.    The Dashire Claim

Sometime in 1995, Jolivet and Vaho became friends with Jacqueline Hawkins. Vaho would help Hawkins pay her bills, and eventually Vaho offered to help Hawkins get insurance on her car. He suggested that she purchase insurance from Shelter Insurance Company (Shelter). In early April, Hawkins received insurance from Shelter, and paid her premium with money she had received from Vaho.

On April 13, 1995, a person claiming to be Jacqueline Hawkins contacted Shelter and advised that she had hit a 1985 Peugeot station wagon[2] driven by Paula Dashire, another fictitious identity. Hawkins later denied she was ever involved in an accident with Dashire and stated that she had not reported any accident to Shelter.

On April 18, 1995, Vaho, identifying himself as James Dashire, contacted Shelter regarding the accident. Thereafter, a Shelter representative came to the defendant's residence to inspect the damage to the station wagon and issued a check

_____

    [2]Jolivet owned a Peugeot station wagon during this time period.

7

payable to Paula and James Dashire to cover the property damage. Jolivet endorsed this check and deposited it into her own bank account.

In May, Shelter wrote to the Dashires at Jolivet's address for more information about the claim. In response, Shelter received information similar to that received by Travelers on the Norwood claim--altered treatment records, invoices, and copies of checks and money orders. After receiving this information, Shelter agreed to settle the Dashire claims, and sent a settlement letter with releases to the Dashires.

The evidence detailed above is sufficient to support Jolivet's convictions. Jolivet was linked to the Norwood fraud by her signature on the altered checks and money orders--purportedly for medical payments--that were presented to Travelers, and by the use of her address for the correspondence between Norwood and Travelers. While not overwhelming, the jury could infer from this evidence that Jolivet was materially involved in the fraud.

Jolivet's convictions on the Dashire claim must also stand. The government produced essentially the same evidence here as with the Norwood claim, but additionally showed that Jolivet deposited some of the proceeds of the Dashire fraud into her own bank account. While we note that the evidence suggests that Vaho was the mastermind of these operations, Vaho's criminal involvement does not absolve Jolivet of responsibility for her part in the wrongdoing.

B.    Conspiracy

Jolivet was convicted of one count of conspiracy to commit mail fraud, money laundering, and interstate transportation of property taken by fraud. In order to convict a defendant of conspiracy, the jury must find (1) an agreement to achieve some illegal purpose; (2) the defendant had knowledge of the agreement; and (3) the defendant knowingly became a party to the agreement. See United States v. Nichols, 151 F.3d

8

850, 851 (8th Cir. 1998). The government must also prove that one of the conspirators performed some act in furtherance of the conspiracy. See United States v. Peterson, No. 99-3680, 2000 WL 1047947, at *2 (8th Cir. July 31, 2000).

Jolivet argues the government established neither that she had knowledge of the conspiracy, nor that she agreed to join it. We disagree. Along with evidence of the Norwood and Dashire claims, the government also presented evidence of two additional fraudulent schemes with a similar modus operandi. In the first claim, Jolivet herself reported she was involved in an accident with Raymond Bras. Vaho played the part of Raymond Bras. Jolivet's insurance adjuster spoke with Jolivet personally about the accident. Meanwhile, as with the Norwood and Dashire claims, Vaho provided the insurance company with phony documentation of medical and personal expenses related to the accident.

In the next scheme, Jolivet again reported that she had caused an accident, this time with David Tracko. Again, Vaho held himself out to be Tracko, the accident victim. Vaho deposited the insurance settlement proceeds in a joint account for himself and the Trackos, and from those proceeds obtained a cashier's check in the amount of $4,700.00, payable to Susan Tracko. This cashier's check was subsequently deposited in Jolivet's bank account, bearing Susan Tracko's endorsement.

The evidence detailed above is more than sufficient to establish a link between Jolivet and the conspiracy. See United States v. Mathison, 157 F.3d 541, 550 (8th Cir. 1998) (noting that slight evidence connecting defendant to conspiracy may be sufficient to convict). She reported some of the fraudulent accidents personally, and she deposited the proceeds of the fraud into her account. Moreover, the insurance companies were presented with altered checks and money orders bearing her signature, and her address was used for correspondences between the insurance companies and the fictitious accident victims. Finding Jolivet's arguments unpersuasive, we affirm her conspiracy conviction.

C.    Money Laundering

Jolivet was also convicted of three counts of money laundering.  In order to be found guilty of money laundering under § 1956(a)(1)(A)(i), the government must prove that the defendant "engaged in financial transactions with the knowing use of the proceeds of illegal activities"  and with the "intent to promote the carrying on" of unlawful activity.  Hildebrand, 152 F.3d at 762 (quoting § 1956(a)(1)(A)(i)).  Thus, although the prohibited conduct is characterized as money laundering, it is different from traditional money laundering because the criminalized act is the reinvestment of illegal proceeds rather than the concealment of those proceeds.  See id. (contrasting § 1956(a)(1)(A)(i)'s prohibition of reinvestment money laundering to § 1956(a)(1)(B)(i)' prohibition of concealment money laundering).

The three counts of money laundering relevant to this appeal stem from Jolivet's deposit of the proceeds she received from the insurance fraud.  The first count relates to the Tracko claim and Jolivet's deposit of the $4,700.00 cashier's check, payable to and endorsed by Susan Tracko, into her account.  The second and third counts are based on Jolivet's deposit of the Norwood and Dashire insurance settlement checks directly into her bank accounts.

With regard to the Norwood and Dashire deposits, the government argues that Jolivet's singular act of depositing the settlement checks into her bank account is sufficient to sustain the convictions.  This argument is based on the premise that Jolivet's acts of endorsing and depositing the checks made the proceeds available for use, thereby furthering the illegal activity.  We disagree.

We begin our analysis by considering the plain language of the statute in question.  The government must prove that the defendant, using illegally-gained proceeds, undertook a financial transaction "with the intent to promote the carrying on of specified unlawful activity." § 1956(a)(1)(A)(i).  It is true that the deposit of funds

10

in a bank account may promote an antecedent unlawful activity by making the funds available to the wrongdoer.  However, the government bears the burden of proving that the money was used to further the carrying on of such illegal activity.  We find no logic in the government's suggestion that Jolivet could promote the carrying on of an already completed crime.  Cf. United States v. Edgmon, 952 F.2d 1206, 1214 (10th Cir. 1991) ("Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'")

We recognize a split among our sister circuits on this issue.  Compare United States v. Paramo, 998 F.2d 1212, 1217-18 (3d Cir. 1993) (holding deposit of illegally obtained check was sufficient to sustain conviction under § 1956(a)(1)(A)(i)), and United States v. Montoya, 945 F.2d 1068, 1076 (9th Cir. 1991) (same), with United States v. Calderon, 169 F.3d 718, 722 (11th Cir. 1999) (reversing § 1956(a)(1)(A)(i) conviction where government presented no evidence that illegal proceeds, once deposited, were spent in furtherance of illegal scheme), and United States v. Heaps, 39 F.3d 479, 486 (4th Cir. 1994) (rejecting broad statutory interpretation employed in Montoya and Paramo as inconsistent with congressional intent;  "[t]he statute should not be interpreted to make any [illegal] transaction a money laundering crime.") Mindful of this conflict, we find the decisions of the Fourth and Eleventh Circuits to be more consistent with the plain meaning of the statute and with congressional intent. See Maura E. Fenningham, Note, A Full Laundering Cycle is Required:  Plowing Back the Proceeds to Carry on Crime is the Crime Under 18 U.S.C. § 1956(a)(1)(A)(i), 70 Notre Dame L. Rev. 891, 938 (1995) (concluding that Third and Ninth Circuits have "misinterpreted the plain language of section 1956(a)(1)(A)(i) in seeking to apply a broader proscription than Congress sought to establish.  While this broad reach may further serve the ultimate legislative goal of thwarting crime through its pocketbook, it does so without legislative support.")

Although we have not squarely addressed this issue before, our earlier jurisprudence provides further guidance and support for our conclusion. In Hildebrand, the defendants were charged with money laundering under § 1956(a)(1)(A)(i) for promoting a scheme to defraud would-be participants in a class action lawsuit. They challenged the sufficiency of the evidence to support their convictions. In analyzing their claims, we referred to this type of money laundering as "'reinvestment' money laundering," recognizing the statute required the government to prove that the defendants expended illegally-obtained proceeds in order to further promote the fraudulent scheme. Hildebrand, 152 F.3d at 762. We affirmed the convictions, noting that the government produced evidence that the illegal proceeds were in fact reinvested because they were used to maintain the defendants' office, the headquarters for the illegal scheme. See id.; but cf. United States v. Brown, 186 F.3d 661, 670 (5th Cir. 1999) (reversing § 1956(a)(1)(A)(i) conviction where government presented evidence that defendant used illegal proceeds to maintain car dealership despite fact dealership was involved in fraudulent activity).

The government directs us to United States v. Nattier, 127 F.3d 655 (8th Cir. 1997), in support of its "deposit money laundering" theory. In Nattier, the defendants were operating International Realty Investments, Inc. (IRI), a Missouri corporation. One of the defendants worked at a bank, and came upon a similarly-named corporation that had unclaimed dividends owed to it. This defendant directed these monies by checks to IRI, which deposited the checks and bought property with the proceeds. We affirmed the money laundering convictions. See Nattier, 127 F.3d at 658-59.

We find Nattier readily distinguishable. Because the illegal proceeds--the dividend payments--were only available to IRI because it was similar in name to the true owner of the dividends, IRI's very existence was an integral element of the scheme. The continued viability of the corporation was necessary to receive further payments, that is, to carry out future crimes. The deposit and investment of funds thus

12

promoted further unlawful activity because it allowed the corporation to stay afloat. See id.

In contrast, Jolivet undertook her fraudulent scheme personally. She did not operate through a corporate shell or other business entity which required revenues to continue its criminal enterprise. Rather, she and Vaho simply undertook to defraud insurance companies, something for which she needed very few resources. Finding no merit to the government's "deposit money laundering" theory, we turn to its next argument.

The government contends that Jolivet is nonetheless guilty of all three counts because she did in fact reinvest the illegally-obtained proceeds in order to promote further crimes. If the government had produced evidence that Jolivet used the insurance settlement monies to continue her schemes, her convictions would stand. See Hildebrand, 152 F.3d at 762. However, that is not the case. While Jolivet and Vaho continued their fraudulent schemes for some time, the government has failed to produce any evidence that either Jolivet or Vaho used the proceeds from any one incident to further their future schemes. Rather, the undisputed evidence showed that most of the money went to pay daily living expenses and to pay credit card debt, and the government admits that it was "not able to track the precise use of the assets after they left the defendant's bank account." (Appellee's Br. at 42.) While the government speculates that the insurance settlement money could have been used to further the schemes, it has produced no evidence to support its conjecture. With no evidence that the proceeds were used for anything other than personal expenses, the government is missing a link essential to a finding of guilt, and accordingly the money laundering convictions must be reversed. See United States v. Olaniyi-Oke, 199 F.3d 767, 770 (5th Cir. 1999).

**CONCLUSION**

For the reasons articulated above, we affirm Jolivet's conspiracy and mail fraud convictions and sentences, but reverse her money laundering convictions and remand to the district court for proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.