# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3559
_____

United States of America

*Plaintiff - Appellee*

v.

Marcin Stanislaw Garbacz

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Western

_____

Submitted: December 16, 2021
Filed: April 27, 2022

_____

Before SMITH, Chief Judge, GRUENDER and KOBES, Circuit Judges.

_____

GRUENDER, Circuit Judge.

When he worked as a priest, Marcin Garbacz stole from the cash-offering collections of several parishes. After a jury trial, he was convicted of wire fraud, money laundering, transporting stolen money, and making and subscribing false tax returns. The district court sentenced him to 93 months' imprisonment. Garbacz appeals his convictions, his sentence, and the district court's forfeiture order and restitution award. We reverse three of Garbacz's convictions and affirm his

remaining convictions, the forfeiture order, and the restitution award. We affirm his sentence, except that we direct the district court to vacate the $100 special assessments associated with Counts 39, 41, and 44.

## I.

Garbacz worked as a Catholic priest serving the Diocese of Rapid City, South Dakota as a school chaplain. Between 2012 and 2018, he resided at three parishes in Rapid City. During that time, Garbacz would enter the parishes during the night and steal cash that had been collected during Mass. As suspicions rose, the bookkeeper at St. Therese the Little Flower Catholic Church started using tamper-proof bags in early March 2018 and immediately noticed that the bags' serial numbers changed without explanation after Sunday Masses, indicating that they had been replaced by someone. The bookkeeper and pastor installed security cameras, and on April 23, Garbacz was caught on video entering the parish between 1:00 a.m. and 1:30 a.m. and stealing cash. Garbacz brought tamper-proof bags with him, pocketed some of the offerings, and sealed the rest into the new tamper-proof bags so that it appeared as if nothing had been changed. Garbacz then would write information on the new bags to match the handwriting that appeared on the originals.

The day Garbacz was caught on video, the bishop of the diocese confronted him and suspended him after he admitted to stealing cash. On the same day, Garbacz withdrew $40,000 from his South Dakota credit-union account. In June, local police interviewed Garbacz, and he admitted to stealing from St. Therese and other parishes over two years, described his method for replacing the tamper-proof bags, and explained that he would deposit the stolen cash into his credit-union account. After he withdrew funds from his account, Garbacz opened an account with U.S. Bank in St. Louis, Missouri, and made a series of cash deposits totaling approximately $39,000 between July and October of 2018.

On May 6, 2019, IRS Special Agent Brian Pickens contacted Garbacz. Garbacz claimed that he had stolen only $600, but Special Agent Pickens told him

that he was investigating a theft of more than $200,000. At that time, Garbacz lived in Kent, Washington and had an account there with J.P. Morgan Chase Bank. By May 10, Garbacz had withdrawn $50,500 from that account, leaving it with a balance of less than $300. Special Agent Pickens testified that the amount withdrawn was "primarily comprised of the $39,000 in cash he had deposited into his U.S. Bank account," which itself came from "the [$]40,000 he had withdrawn from his [credit union] account on April 23rd of 2018." Garbacz's internet search history around that time showed inquiries about moving to Poland, withdrawing cash "without triggering the IRS," and storing money in offshore accounts.

After speaking to Special Agent Pickens, Garbacz shipped eighteen boxes containing valuable statues to Josh VanBuskirk in Wyoming. Garbacz also bought a plane ticket for VanBuskirk to fly to Washington and instructed him to retrieve valuable items from a storage unit there. Garbacz told VanBuskirk to sell the valuables and wire half of the proceeds to him. The IRS eventually seized the items.

Garbacz booked a flight to Poland and sent a text message to VanBuskirk, saying that Garbacz would "start telling people [he] moved to England" and that he "d[id]n't want the feds to find out." Garbacz was arrested on May 10, 2019, at the airport. He had $10,500 in cash on his person and valuable items, including ornate chalices, in his luggage.

Garbacz was charged with forty-seven counts of wire fraud regarding cash deposits into his credit-union account and three counts of wire fraud regarding wire transfers from the credit-union account to pay balances on his credit card. He was also charged with nine counts of money laundering regarding cash withdrawals made over three days from his savings and checking accounts after learning he was under federal investigation and before his planned flight to Poland. Another count alleged that Garbacz transported stolen money in interstate commerce when he withdrew $40,000 from the South Dakota credit-union account and deposited $39,000 in his Missouri bank account. Five counts alleged that he willfully made

and subscribed false tax returns from 2013 to 2017 by omitting money he had embezzled.

Garbacz pleaded not guilty, and the case proceeded to trial. At trial, Special Agent Pickens testified that Garbacz's after-tax earnings from 2012 to 2018 were approximately $93,000, yet he had paid $398,837.09 from his credit-union account to his credit card to cover purchases made during that time. Garbacz's annual pre-tax salary as a priest ranged from approximately $20,000 to $24,000. His salary was paid through electronic fund transfers and checks, but his "single greatest source of income" came from cash deposits into his credit-union account.

Testimony indicated that Garbacz engaged in "a consistent pattern of cash deposits" on a near-weekly basis until he was caught on video, after which the deposits stopped. He often made the deposits late at night, and "cash deposits tended to occur shortly after weekend masses." Special Agent Pickens testified that "[t]he denominations of cash" Garbacz deposited—including large amounts of five-dollar and ten-dollar bills—were "consistent with . . . the collections at parishes in Rapid City."

Garbacz's colleagues testified that when asked about his expensive statues, Garbacz told them that his family in Poland regularly sent him cash. However, there was no evidence of wire transfers or incoming checks from Poland, and Garbacz's acquaintances who visited his family in Poland observed that they did not appear wealthy. Some of Garbacz's valuables were engraved with dates or names indicating that they were gifts, but there was evidence that Garbacz fabricated those engravings. For example, one chalice bore the name of Garbacz's colleague, Seth Thomas Smith, yet Smith testified that he had no knowledge of the item and had nothing to do with it. Evidence at trial showed that Garbacz had transferred money from his credit-union account to pay art dealers and manufacturers for expensive religious items, such as chalices. Special Agent Pickens testified that Garbacz could not have afforded these items on his legitimate salary.

The jury convicted Garbacz on all counts. The district court then held a forfeiture hearing, where Garbacz objected to the forfeiture of two statues because he claims he purchased them with legitimate funds. To show that Garbacz could not have afforded the items with legitimate funds, the Government introduced evidence of Garbacz's legitimate disposable income for each year at issue, calculated by subtracting tax and recurring payments from Garbacz's total reported income.

One of the objected-to forfeitures concerned the "Chroma" statue, which had a purchase price of $14,000 at the time Garbacz bought it in February 2018. His legitimate disposable income in the first half of that year was about $6,855.44, and it was $11,727.88 the previous year. The Chroma statue purchase coincided with transfers of funds from Garbacz's credit-union account to his credit card. Separate from the Chroma statue purchase, Garbacz had purchased more than $34,000 worth of religious items during the first two months of 2018.

Garbacz also objected to the forfeiture of the "Nureyev" statue, which he bought with his credit card for $12,500 in 2016. That purchase coincided with a payment from his credit-union account to the credit card. In 2016, Garbacz's legitimate disposable income was $5,671.84. He transferred at least $41,135 from his credit-union account to his credit card in that year. Special Agent Pickens testified that Garbacz could not have afforded either statue with legitimate income. The district court ordered forfeiture of the statues and other property.

Then the court held a restitution hearing. Special Agent Pickens testified that the cash deposits to the credit-union account involved stolen cash. The pastors of the three parishes requested that any restitution ordered be split evenly among the three parishes. The Government sought $259,696.19 in restitution to be divided among the parishes and $46,008 to go to the IRS, representing unpaid taxes. The district court ordered $46,008 in restitution to the IRS and $258,696.19 in restitution to the parishes, accounting for a possible $1,000 that Garbacz may have received in stipends for performing priestly services.

At sentencing, Garbacz objected to a two-level "sophisticated means" enhancement under U.S.S.G. § 2B1.1(b)(10). The district court concluded that the enhancement applied, reasoning that Garbacz's acquisition of the tamper-proof bags, altering their labels, and replacing cash in them over many years showed sophistication. Garbacz was sentenced to 57 months' imprisonment for each of Counts 1 through 60, to run concurrently, and 36 months' imprisonment for each of Counts 61 to 65 (the tax counts), also to run concurrently. The two sets of counts were to run consecutively, resulting in a total of 93 months' imprisonment. The district court imposed a $100 special assessment for each count. Garbacz appeals, challenging the sufficiency of the evidence supporting his wire fraud convictions (Counts 1 to 50), his conviction for transporting stolen money (Count 60), his money laundering convictions (Counts 51 to 59), and his tax convictions (Counts 61 to 65). He also appeals the forfeiture order, the restitution award, and the application of the sophisticated-means enhancement to his sentence.

## II.

We review *de novo* challenges to the sufficiency of the evidence, viewing "the evidence in the light most favorable to the guilty verdict" and "granting all reasonable inferences that are supported by that evidence." *United States v. Johnson*, 745 F.3d 866, 869 (8th Cir. 2014). "We will reverse the conviction only if . . . we conclude that no reasonable trier of fact could find guilt beyond a reasonable doubt." *United States v. Proffit*, 49 F.3d 404, 406 (8th Cir. 1995). Sufficiency-of-the-evidence arguments raised for the first time on appeal, however, are reviewed for plain error. *United States v. Ruzicka*, 988 F.3d 997, 1008 (8th Cir. 2021).

## A.

Garbacz claims that the evidence was insufficient to support his wire fraud convictions under 18 U.S.C. § 1343. "Under § 1343, the government must prove (1) intent to defraud, (2) participation in a scheme to defraud, and (3) the use of a wire

in furtherance of the fraudulent scheme." *United States v. Burns*, 990 F.3d 622, 627 (8th Cir. 2021) (internal quotation marks omitted). Because "each use of a wire is a separate violation of the wire fraud statute, there may be multiple violations arising from a single fraudulent scheme." *United States v. Rice*, 699 F.3d 1043, 1047 (8th Cir. 2012) (citations omitted).

Garbacz advances two arguments: (1) there was insufficient evidence that his credit-union deposits and transfers furthered a fraudulent scheme, and (2) there was insufficient evidence that they involved stolen cash.

1.

We first address the argument that Garbacz's credit-union deposits did not further a fraudulent scheme because, he asserts, the scheme was complete once the cash was taken. Although Garbacz challenged the sufficiency of the evidence in his acquittal motion, he did not make this particular argument before the district court. Accordingly, we review for plain error. *See Ruzicka*, 988 F.3d at 1007-08 (reviewing for plain error where the appellant "forfeited [the] argument by failing to make it in a motion for acquittal or a motion for a new trial"); *United States v. Chastain*, 979 F.3d 586, 592 (8th Cir. 2020).

To show plain error, Garbacz "must establish that (1) the district court committed an error, (2) the error is clear and obvious, and (3) the error affects his substantial rights." *See Chastain*, 979 F.3d at 592. "If those three conditions are met, the district court has discretion to correct the error if it seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Camp*, 410 F.3d 1042, 1047 (8th Cir. 2005).

The use of a wire furthers a fraudulent scheme if it is "a part of the execution of the fraud" that is at least "incident to an essential part of the scheme." *United States v. McKanry*, 628 F.3d 1010, 1017 (8th Cir. 2011). If the use of the wire occurs "after [the] scheme reaches fruition," it is generally not in furtherance of the

-7-

fraudulent scheme. *See United States v. Taylor*, 789 F.2d 618, 620 (8th Cir. 1986) (stating the standard for mail fraud); *United States v. Cole*, 721 F.3d 1016, 1021 (8th Cir. 2013) ("The elements of wire fraud under 18 U.S.C. § 1343 are identical to the elements of mail fraud except that wire fraud involves interstate wire communications rather than mail.").

Ordinarily, a criminal's use of misappropriated cash, whether he spends it or places it into his bank account, is not part of the scheme used to obtain it. *See United States v. Redcorn*, 528 F.3d 727, 739 (10th Cir. 2008) ("[A]t some point the fraudulent scheme must be complete, and the perpetrators' subsequent enjoyment of its fruits—buying groceries, going to the movies, redecorating the bathroom—is not an 'essential' part of the scheme." (quoting *Taylor*, 789 F.2d at 620)). But uses of wires "which are designed to lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect" further the fraudulent scheme. *See United States v. Tackett*, 646 F.2d 1240, 1243 (8th Cir. 1981). In cases of repeated or continuous fraud, this includes uses of wires that are "essential . . . to keep [the] ongoing scheme from coming under scrutiny." *See United States v. Fiorito*, 640 F.3d 338, 348 (8th Cir. 2011).

The district court did not plainly err in failing *sua sponte* to disturb the jury's finding that Garbacz's cash deposits furthered his fraudulent scheme. Garbacz lived communally with other priests who knew about his modest salary and might well have suspected wrongdoing if they discovered significant amounts of cash on the premises in denominations characteristic of church offerings. Assuming the deposited money comprised stolen cash, a reasonable jury could believe that the cash deposits, often occurring in the dead of night, were designed to "postpone inquiries," *see Tackett*, 646 F.2d at 1243, and "to keep [the] ongoing scheme from coming under scrutiny," *see Fiorito*, 640 F.3d at 348.

Garbacz relies on *United States v. Jolivet*, where we reversed money laundering convictions based on deposits of cash obtained through insurance fraud. 224 F.3d 902, 909-11 (8th Cir. 2000). In *Jolivet*, we rejected the view that actions

"mak[ing] the proceeds available for use" thereby "further[] the illegal activity." *Id.* at 909. Mere deposits of fraudulently obtained cash, we held, could not "promote the carrying on of an already completed crime." *Id.* We recognized in *Jolivet*, however, that "[i]f the government had produced evidence that Jolivet used the . . . monies to continue her schemes, her convictions would stand." *Id.* as 911. Even assuming that the money-laundering element at issue in *Jolivet*—"intent to promote the carrying on" of unlawful activity, 18 U.S.C. § 1956(a)(1)(A)(i)—is equivalent to the "furtherance" element of a wire fraud conviction, *see Burns*, 990 F.3d at 627, the record permits a finding that the deposits were used to hide stolen cash from those who would discover it. Garbacz was thus doing more than simply "ma[king] the proceeds available for use." *See Jolivet*, 224 F.3d at 909.

The district court did plainly err, however, in upholding the wire fraud convictions on Counts 39, 41, and 44, which involved transfers of funds rather than cash deposits. Each of these counts relates to an occasion when, usually within a couple days after depositing cash in his credit-union account, Garbacz transferred a similar amount of money from that account to his credit card. No reasonable jury could find that these actions furthered a fraudulent scheme. Once the cash was securely in the credit-union account, the danger that it would expose Garbacz's scheme to fellow priests was eliminated. Unlike the cash deposits, Garbacz used the transfers to pay off debt, not to keep suspicions at bay. On this record, no reasonable juror could conclude that the transfers "assist[ed] in carrying out the fraud." *See McKanry*, 628 F.3d at 1017.

The credit card transfers were not "essential to the perpetuation of Garbacz's scheme," as the Government argues. Although Garbacz used his credit card to purchase expensive items that he then passed off as gifts from others, those purchases themselves were not part of the fraud. Indeed, as Garbacz points out, the unnecessary purchases undermined his fraudulent scheme, as the appearance of extravagant spending caused other priests to ask Garbacz how he acquired the items. *See United States v. Nguyen*, 829 F.3d 907, 921 (8th Cir. 2016) (noting that mailings are not in furtherance of a fraudulent scheme if their purpose "conflicts with, rather

than promotes, the scheme"). If the purchases were not in furtherance of the scheme, then neither were the transfers that paid the balance for those purchases. *See McKanry*, 628 F.3d at 1017.

The connection between the transfers and the fraudulent scheme is so attenuated that the district court's error is "clear and obvious." *See Chastain*, 979 F.3d at 592. The error made the difference in convicting Garbacz on three counts, so it affected Garbacz's substantial rights, *see id.*; *Puckett v. United States*, 556 U.S. 129, 135 (2009) (noting that an error affected substantial rights if it "affected the outcome of the district court proceedings"), and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," *see Rosales-Mireles v. United States*, 585 U.S. ---, 138 S. Ct. 1897, 1909 n.4 (2018). Accordingly, we reverse the convictions on Counts 39, 41, and 44.

2.

Garbacz argues there was insufficient evidence that the cash he deposited had been stolen. He cites evidence that priests were sometimes tipped for performing services like baptisms and that he was caught stealing cash only in 2018, not the prior years. Because he raised this argument before the district court, we review it *de novo*. *See Ruzicka*, 988 F.3d at 1007.

Garbacz cannot overcome the "heavy burden" in overturning his conviction based on the sufficiency of the evidence. *Proffit*, 49 F.3d at 406. Garbacz was caught on camera stealing from a parish, and he admitted to stealing from multiple parishes. Throughout the years when the relevant deposits were made, cash offerings were unusually low in the three parishes while donations through check and online payments remained the same, as did church attendance. Once Garbacz was caught stealing, he completely stopped making deposits, and cash offerings went back up in those parishes. The deposits Garbacz made were in denominations characteristic of church offerings. And they tended to occur "shortly after weekend masses," when Garbacz would have been able to steal without being detected.

Further, the amount of cash Garbacz was depositing far exceeded his salary, which was paid to him through direct deposit, and there was no evidence of other sources of income coming close to that amount. Although priests did sometimes receive tips or stipends for their services, the evidence showed that a high school chaplain would not have received such tips in a significant amount. After Garbacz was caught, he removed all the money from his account and researched how to flee the country with stolen cash. In these circumstances, a reasonable juror could find beyond a reasonable doubt that each deposit involved stolen cash. *See Proffit*, 49 F.3d at 406.

B.

We next turn to the sufficiency of the evidence supporting the conviction for transporting stolen money under 18 U.S.C. § 2314. The statute prohibits transporting in interstate commerce any "money, of the value of $5,000 or more, knowing the same to have been stolen." *Id.* The conviction was based on Garbacz's 2018 transportation of a cashier's check for $15,379.60 and $7,000 in cash from South Dakota to Missouri, where he deposited the money into his St. Louis U.S. Bank account.

Garbacz argues that the money he transported was legitimate because his credit-union account contained a mixture of stolen cash and legitimate funds. He relies on *United States v. Poole*, where the defendant fraudulently acquired a check in the amount of $55,445.85 and deposited it into his Louisiana bank account, mixing it with the legitimate funds. *See* 557 F.2d 531, 533-34 (5th Cir. 1977). The defendant then issued a check in the same amount of money and transported it to be deposited in a Texas account. *Id.* at 534. The Fifth Circuit reversed the conviction because "there were sufficient surplus funds in the [Louisiana] account to pay that check without applying the proceeds of [the fraudulently acquired] check. *Id.* at 536.

According to Garbacz, on his salary of $20,000 to $24,000 per year, his total earnings over the relevant six-year period would have exceeded $100,000 and, therefore, the transported $22,379.60 should be considered to be legitimate, not

stolen cash. That argument overlooks his spending during that period. Evidence indicated that Garbacz spent almost $400,000 between 2012 and 2018 through credit-card payments financed from his credit-union account. Of that, $145,000 was spent on chalices and other expensive items introduced at trial. A reasonable jury could find that Garbacz exhausted his legitimate money with those payments so that the remaining money transported to Missouri was stolen. *Cf. United States v. Ratliff*, 893 F.2d 161, 163-64 (8th Cir. 1990) (holding that the jury's conclusion was "entirely reasonable" that more than $5,000 of transported money was stolen, notwithstanding the use of $20,000 dollars from an "unidentified source" in the scheme).

C.

Garbacz also challenges the sufficiency of the evidence supporting his nine convictions for money laundering by concealment under 18 U.S.C. § 1956(a)(1)(B)(i). To prove money laundering by concealment, the Government must show that

> (1) the defendant conducted, or attempted to conduct a financial transaction which in any way or degree affected interstate commerce or foreign commerce; (2) the financial transaction involved proceeds of illegal activity; (3) the defendant knew the property represented proceeds of some form of unlawful activity; and (4) the defendant conducted or attempted to conduct the financial transaction knowing the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity.

*United States v. Sainz Navarrete*, 955 F.3d 713, 719 (8th Cir. 2020) (brackets omitted). The money laundering convictions stem from Garbacz's withdrawal of $50,500 from his bank account within four days of learning he was the suspect in a federal criminal investigation. Garbacz repeats his argument that "it is unclear that any given cash deposit was stolen," and that even if it was, the cash was commingled with legitimate funds. We have already rejected both arguments, and we hold that a

-12-

reasonable jury could have found that the withdrawals "involve[d] the proceeds of" wire fraud and were part of an attempt to conceal those proceeds from Government investigators. *See* § 1956(a)(1)(B)(i). Indeed, Garbacz's concealment scheme was partially successful because the whereabouts of $40,000 of the withdrawn cash remain unknown.

## D.

Garbacz argues there was insufficient evidence to prove he filed a false tax return by failing to report his deposits of stolen cash offerings to the IRS. A taxpayer files a false tax return when he "[w]illfully makes and subscribes any return . . . which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1). Stolen funds must be reported as income. *United States v. Renner*, 648 F.3d 680, 687 (8th Cir. 2011) (citing *James v. United States*, 366 U.S. 213, 219-20 (1961)); *United States v. Milder*, 459 F.2d 801, 803-04 (8th Cir. 1972). Thus, the "intentional violation of a known legal duty" to report stolen income violates the statute. *See United States v. Mathews*, 761 F.3d 891, 893 (8th Cir. 2014) (stating that willfulness "simply means a voluntary, intentional violation of a known legal duty").

"Intent may be inferred from conduct" such as "a consistent pattern of not reporting income or inconsistently reporting income." *Id.* (internal quotation marks omitted). Here, a reasonable jury could have found that Garbacz's failure to report income was willful because he consistently failed to report his illegitimate income while successfully reporting his legitimate income. *See id.* at 393-94.

Garbacz claims he was entitled to a defense under *Cheek v. United States*, 498 U.S. 192, 201 (1991), arguing that the Government failed to prove his underreporting was willful because he did not know he had a legal duty to report illegally acquired

cash.[1]  Moreover, he argues that because the stolen cash came from "a tax exempt source" (that is, the church), there was even less reason to believe that he would have to pay taxes on the stolen donations.

"Although ignorance of the law traditionally is no defense, Congress has carved out an exception to that rule in certain criminal tax statutes by making 'specific intent to violate the law' one of the elements."  *United States v. Hildebrandt*, 961 F.2d 116, 118 (8th Cir. 1992) (quoting *Cheek*, 498 U.S. at 200).  Citing the *Cheek* decision's reference to a "good-faith misunderstanding and belief *submission*," *Cheek*, 498 U.S. at 202 (emphasis added), the Government suggests that the *Cheek* defense does not apply because Garbacz did not submit evidence about his subjective belief.  Instead, the defense argued before the jury merely that "the government hasn't proven that [Garbacz] knew or believed his tax returns to be correct" and that the duty to report illegitimate income is "not something that everybody knows."

Regardless of how we interpret the Supreme Court's reference to an evidential "submission," we hold that there was sufficient evidence to overcome a *Cheek* defense.  *See id.*  In *Cheek*, the defendant claimed he had a good-faith belief that his wages were not income.  *Id.* at 195-96.  The Court noted that "in deciding whether to credit [the defendant's] good-faith belief claim, the jury [is] free to consider any admissible evidence from any source showing that [the defendant] was aware of his duty to file a return and to treat wages as income, including evidence . . . of court decisions rejecting his interpretation of the tax law."  *Id.* at 202.  Here, there was sufficient evidence for a jury to infer that Garbacz knew about his tax duties.  Garbacz personally filed his tax returns each year and a fellow priest testified that Garbacz was proud of his ability to handle his tax affairs.  Further, the duty to report stolen income is well established in law.  *See Renner*, 648 F.3d at 687; *Milder*, 459

---

[1]Garbacz does not argue that the district court incorrectly instructed the jury on the issue of willfulness or that a separate jury instruction about good-faith belief under *Cheek* was required.  *See United States v. Ervasti*, 201 F.3d 1029, 1041 (8th Cir. 2000).

F.2d at 803-04; *James*, 366 U.S. at 219-20.  On this record, a reasonable jury could find that Garbacz was informed enough to know about his duty to report his income, including income from stolen cash.

## III.

We next turn to the claim that Garbacz should not have been ordered to forfeit the Chroma and Nureyev statues.  On appeal of a forfeiture order, we review factual findings for clear error and the ultimate decision to order forfeiture *de novo*.  *United States v. Hull*, 606 F.3d 524, 526-27 (8th Cir. 2010).

Garbacz argues that the district court erred by applying the criminal-forfeiture statute instead of the civil-forfeiture statute because "general wire fraud" convictions are subject to civil forfeiture.  He cites *United States v. Waits*, 919 F.3d 1090, 1096-97 (8th Cir. 2019), where we vacated a forfeiture order in part because the Government relied "on an incorrect forfeiture statute"—the statute governing criminal forfeiture, 18 U.S.C. § 982(a)(3)(F)—and we noted that "[t]he statutes that authorize forfeiture of property traceable to a wire fraud conspiracy" are the civil-forfeiture statute, 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461.  But the criminal-forfeiture statute was inappropriate in *Waits* because the Government had invoked subparagraph (a)(3)(F), which "applies only to offenses that involve a sale of assets acquired or held by the Federal Deposit Insurance Corporation, the National Credit Union Administration, or another conservator appointed by the Office of the Comptroller of the Currency," and the assets in that case "did not meet those criteria."  *Waits*, 919 F.3d at 1096.  Here, the Government seeks forfeiture through a different provision of the criminal-forfeiture statute, subparagraph (a)(2)(A), which authorizes forfeiture for wire fraud convictions "affecting a financial institution."  *See* 18 U.S.C. § 982(a)(2)(A) (listing qualifying statutes, including 18 U.S.C. § 1343).  The Government asserts that Garbacz's use of banks to deposit, transfer, and withdraw cash affected those banks by increasing their risk of loss.  Garbacz counters that the words "affecting a financial institution" refer to forms of wire fraud that carry a higher maximum penalty and sentence.  *See* 18 U.S.C. § 1343

-15-

(imposing a higher maximum sentence for wire fraud convictions "[i]f the violation . . . affects a financial institution"). Garbacz argues that because he was not convicted under the more specific provision carrying the higher maximum penalty and sentence, the criminal-forfeiture statute cannot apply.

Regardless of which statute applies, the Chroma and Nureyev statues were forfeitable. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Under both statutes, the Government bears the burden of proving a sufficient nexus between the property and the offense by a preponderance of the evidence. *See* 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A); *United States v. Beltramea*, 785 F.3d 287, 290 (8th Cir. 2015). As relevant here, the required nexus in the criminal forfeiture statute is that the property must "constitut[e ]or [be] derived from[] proceeds *the person obtained directly or indirectly*, as the result of [the offense]." § 982(a)(2)(A) (emphasis added). The civil forfeiture statute requires that the property "constitutes or is derived from proceeds *traceable to*" the offense. § 981(a)(1)(C) (emphasis added). The Chroma and Nureyev statues satisfy both standards. The district court found by a preponderance of the evidence that Garbacz purchased the statues with proceeds of his wire fraud scheme. This was not clear error because there was ample evidence that immediately after Garbacz purchased the statues, he paid off his credit-card debt with stolen cash that he had deposited into his credit-union account. He bought the Nureyev statue for $12,500 with a credit card, and three days later, he transferred $12,692.17 to his credit card from his credit-union account. The Chroma statue cost $14,000, and Garbacz transferred $10,182.74 to his credit card on the day he purchased the statue and transferred $6,000 more eleven days later. Each statue cost more than half of Garbacz's legitimate annual income, the record undermined Garbacz's claim that his family had been sending him thousands of dollars, and the evidence showed that Garbacz had been depositing large amounts of stolen cash into his credit-union account for years. The statues, then, were derived from proceeds that were "obtained directly or indirectly" as a result of wire fraud and were "traceable to" wire fraud. *See* §§ 982(a)(2)(A), 981(a)(1)(C). Accordingly, we affirm the forfeiture order.

-16-

Next, we address Garbacz's claim that the restitution award to the three parishes and the IRS was improper. We review the district court's decision to award restitution for abuse of discretion and the district court's factual findings about the amount of loss for clear error. *United States v. Chalupnik*, 514 F.3d 748, 752 (8th Cir. 2008).

The Government has the burden to prove the amount of restitution based on a preponderance of the evidence, *see id.* at 754, and a restitution award is "limited to the victim's provable actual loss," *United States v. Adejumo*, 848 F.3d 868, 870 (8th Cir. 2017). However, "a district court is charged only with reasonably estimating the loss when the amount lost through fraud is difficult to estimate." *Id.* at 870 (internal quotation marks omitted).

Garbacz argues that the restitution awards were based on the "unjustified" finding that "every penny of each deposit was stolen from the churches." He relies on evidence that he would have "received a nominal amount of cash tips" for his services as a priest. But as we have discussed, the evidence supported a finding that each charged deposit involved stolen cash; that Garbacz served as a school chaplain and would not have received a significant amount in tips; that "cash collections were unusually low . . . during the years in which the Defendant had access to the parishes"; and that after Garbacz left South Dakota, those parishes' cash collections increased in an unusual amount. Therefore, the district court did not clearly err in finding that the sum of the illegal deposits, $259,696.19, less $1,000 of possible stipends, was stolen from the parishes.

Garbacz also claims that the district court abused its discretion by ordering restitution when there was uncertainty about the specific loss of each parish. He relies on testimony suggesting that the parishes had poor bookkeeping practices, making it impossible to know exactly how much had been stolen from an individual parish. Although circumstances make it "difficult to estimate" the loss of an

individual parish, we think that the district court's equal division of the total award is a "reasonabl[e] estimate[]" of the loss, given that each parish had agreed to and requested that outcome. *See id.* Although concerns may arise in another case where the uncertainty of individual losses raises doubts about the total amount of loss, *see id.* at 871, here, the total amount is calculable from the deposits and is tied to the three parishes. And as the Government points out, the district court's award is likely lower than the actual amount stolen because it does not account for cash that Garbacz may have spent outright instead of depositing into his credit-union account. Therefore, the district court did not abuse its discretion in awarding $258,696.19 and dividing it equally among the parishes.

## V.

Finally, Garbacz asks us to vacate his sentence and remand for resentencing to the extent that we reverse his convictions and, in any event, to remand for resentencing because the district court erred in applying the "sophisticated means" sentencing enhancement. Although we reverse Garbacz's convictions for Counts 39, 41, and 44, we do not remand for resentencing on that ground because the sentences for those counts ran concurrently with the sentences for the first sixty counts. *See Nguyen*, 829 F.3d at 922 ("[B]ecause the sentence for this conviction ran fully concurrently with [the defendant's] . . . sentence on multiple properly obtained counts of conviction—including seven other mail-fraud counts—we do not disturb the prison sentence."); *United States v. White Bull*, 646 F.3d 1082, 1096 (8th Cir. 2011) (declining to remand for resentencing where "the vacated convictions would not affect [the defendant's] sentence for" the remaining count). We do, however, remand to the district court with instructions to vacate the $100 special assessments associated with Counts 39, 41, and 44. *See Nguyen*, 829 F.3d at 922.

"Whether an offense involved sophisticated means is a factual finding that we review for clear error." *United States v. Belfrey*, 928 F.3d 746, 753 (8th Cir. 2019) (internal quotation marks omitted). The sentencing guidelines instruct courts to increase a defendant's offense level by two levels if the offense "involved

-18-

sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). An offense involved sophisticated means if, "viewed as a whole," the offense conduct is "notably more intricate than that of the garden-variety offense." *Belfrey*, 928 F.3d at 753 (brackets omitted). "Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." *United States v. Meadows*, 866 F.3d 913, 917-18 (8th Cir. 2017) (upholding the sophisticated-means enhancement where a fraudulent scheme "lasted for around seven years"; defrauded a large amount of money from a large number of people; and involved regularly lying to investors, Ponzi payments, and improper use of tax and investment forms).

In *United States v. Mitchell*, we held that the defendants' offenses involved sophisticated means where they "fraudulently obtained [a] Social Security number"; "fabricated employment information"; and over a period of months, created counterfeit driver's licenses and credit cards containing the victims' account information. 914 F.3d 581, 586-87 (8th Cir. 2019). They used those credit cards to buy gift cards which, in turn, they used to purchase "more than $16,000 worth of merchandise and gift cards." *Id.* at 587. Although none of the activities "[t]aken alone" was "extraordinarily intricate," the defendants' "repetitive and coordinated conduct . . . over the course of several months amounted to a sophisticated scheme." *Id.* at 586-87 (internal quotation marks omitted).

In light of *Mitchell*, it was not clear error to find that Garbacz employed sophisticated means. His scheme lasted six years, and he repeated the same steps to steal cash donations from three parishes while evading discovery. Those steps involved obtaining tamper-proof bags like those used by the parishes, forging handwriting, and resealing the cash he did not take inside the substituted bags to evade detection. The evidence also showed that Garbacz further protected his scheme by paying to engrave his valuables so that they looked like gifts instead of purchases that he could not afford on his salary as a priest. As in *Mitchell*, this "repetitive and coordinated conduct" is sufficiently intricate to warrant the sophisticated-means enhancement. *See id.* at 587.

## VI.

For the foregoing reasons, we reverse the convictions on Counts 39, 41, and 44, and we remand to the district court to vacate the special assessments associated with those counts. We otherwise affirm the sentence, the remaining convictions, the forfeiture order, and the restitution award.

_____